922 F.2d 843
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
1988 TOYOTA SUPRA and Robert Budwick, Defendants/Appellants.
 No. 90-1345.
 United States Court of Appeals, Seventh Circuit.
 Submitted Nov. 26, 1990.*
Decided Jan. 7, 1991.
 
 Before WOOD, JR., COFFEY and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Appellant Robert Budwick claims that the district court erred in finding that he was "willfully blind" to the fact that his son, Michael Budwick, was using their jointly-owned, 1988 Toyota Supra sports car in furtherance of drug trafficking. The government sought forfeiture of the car under 21 U.S.C. Sec. 881(a) (1981 & Supp.1990), and Robert filed an "innocent owner" claim for the car's return. The court, after a bench trial, held that the entire automobile was forfeited to the United States.
 
 I.
 
 2
 Section 881(a) of Title 21 permits the federal government to forfeit property used in the trafficking of illegal narcotics. In this case, the parties stipulated that the Toyota was used by Michael to traffic illegal drugs during a two month period in late 1988, and that the title to the car was placed jointly in the names of Robert and Michael. The issue at trial was whether Robert was able to prove that he fell under the "innocent owner" exception:
 
 
 3
 [N]o conveyance shall be forfeited under this paragraph to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of the owner.
 
 
 4
 Id. Sec. 881(a)(4)(C). Robert therefore had to prove that he had no knowledge of, or was not willfully blind to, Michael's use of the car in furtherance of his drug trafficking activities.
 
 
 5
 Evidence adduced at trial showed that the Toyota was purchased on October 8, 1988, with a $16,000 down payment and the remaining $11,000 in a bank loan. The down payment came from three sources: (1) a personal check for $5000 from the joint account of Robert and his wife, Roberta; (2) a money order for $6000 purchased by Robert from the American State Bank; and (3) a money order for $5000 purchased by Robert from the First National Bank of Kenosha.
 
 
 6
 Robert claimed that the $16,000 down payment was compiled from a $3000 loan from his father (the first loan he had ever sought from his father) and cash reserves kept in a box at home. The sources of the cash reserves included the settlements from two lawsuits; the sales proceeds from a Winnebago, a boat, and a camper; excess wages from a second job; and recent anniversary presents.[1] These events had occurred over the course of a number of years, but the money had allegedly been saved and kept at home over this time period.
 
 
 7
 There was conflicting testimony on who was to use the Toyota. Robert claimed that he purchased the car because Michael's Volkswagen was breaking down and he needed a new car, implying that the Toyota was specifically intended for Michael's use. Robert also testified, however, that he and his wife needed a new car, although he did not tell his wife about the purchase of the $27,000 Toyota until after the fact; he claimed that he only added Michael's name to the sales contract and title to help establish his credit rating. Finally, Robert claimed that he purchased the Toyota as an incentive for Michael to return to college and finish his degree, although it appears that Robert never explicitly offered this "deal" to Michael.
 
 
 8
 The evidence also revealed that Robert and Roberta knew that their son had a cocaine addiction problem. In late 1987, the family discussed placing Michael in a rehabilitation program but instead allowed Michael to return home for a few weeks to straighten out. Michael then moved out of the house and lived first in Milwaukee and later in Chicago. Robert and Roberta were unable to say with any specificity where Michael worked in Chicago, how he supported his apartment and lifestyle, or why he put so much mileage on both the Volkswagen[2] and Toyota.[3] Regarding Michael's employment, Robert testified that Michael claimed to be refurbishing apartment buildings in Chicago, but that Michael "was very confidential on his rehab job he was with, almost secretive"; he concluded: "I should have suspected something, but I didn't."
 
 
 9
 The district court held that Robert failed to meet his burden of proof on his section 881(a)(4)(C) claim. The court held that Robert's conflicting testimony seriously impaired his credibility as a witness. The court suspected that Michael supplied the cash for the Toyota's down payment,[4] and that Robert had, in essence, co-signed for the financed remainder. The court concluded that numerous "red flags" were raised by the events leading up to Michael's arrest, and that the Budwicks "didn't want to believe that their son was trafficking in controlled substances ... [I]t was only their desire not to know what was going on that could have kept them from realizing what it was that Michael was doing."
 
 II.
 
 10
 On appeal, Robert claims that the district court erred in finding that he was willfully blind to Michael's use of the Toyota in furtherance of his drug trafficking activities. This is essentially a challenge to the court's findings of fact, which we review under the "clearly erroneous" standard. United States v. $215,300 United States Currency, 882 F.2d 417, 420 (9th Cir.1989); United States v. One 1980 Bertram 58' Motor Yacht, 876 F.2d 884, 886 (11th Cir.1989). Unless we are left with the firm conviction that a mistake has been made, we defer to the district court's findings. 215,300 United States Currency, 882 F.2d at 420. In particular, credibility determinations must be left to the district court judge who was present and observed the demeanor of the witnesses. Id.; see generally Fed.R.Civ.P. 52(a).
 
 
 11
 Judge Crabb in this case based her findings of fact largely on the stipulations of the parties and the credibility of Robert Budwick's testimony. The judge specifically found that Robert's "explanations [were] so contradictory as to seriously impair his credibility as a witness." Later the court noted that part of his testimony was "irrational and, frankly, unbelievable." Robert spends the majority of his brief arguing that he had no actual knowledge of Michael's activities, but he fails to address the issue of willful blindness. Given the contradictory testimony and the district court's credibility determinations, we refuse to find fault with the district court's conclusions. Robert realized his son, who once had a drug problem, was working in an unknown job in Chicago but still had the time and money to put incredible mileage on two different cars. Robert's explanations regarding the purchase of the Toyota were facially inconsistent and raised doubts about whose idea it was (and whose money was used) to purchase the Toyota. In sum, the district court was not clearly erroneous in finding that Robert failed to meet his burden of proof under 21 U.S.C. Sec. 881(a)(4)(C).
 
 
 12
 AFFIRMED.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Rule 34(a), Fed.R.App.P.; Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the briefs
 
 
 [1]
 The parties stipulated that no withdrawals were made from any bank or savings accounts owned by Robert or Roberta to purchase the money orders or to cover the personal check. Robert apparently deposited $5000 in cash in his checking account a few days after he wrote the check to the car dealership. This money was not withdrawn from a bank account, but allegedly came from cash kept at the Budwick household. Likewise, the money orders were allegedly purchased with cash from the box kept at home
 
 
 [2]
 Robert testified that he purchased a new engine and made other repairs on Michael's Volkswagen in the spring of 1988. The car broke down soon thereafter, but there was no recourse to the warranty on the new engine since Michael placed over 12,000 miles on the car in a three month period and the warranty was "used up."
 
 
 [3]
 The Toyota had over 7000 miles on it two months after it was driven off of the lot. Robert testified that he did not take it on any long trips or use it to commute to work. He conceded that Michael was responsible for placing a large number of miles on the car when he "borrowed" it from Robert. Robert claimed that Michael had only borrowed the car three times in the two month period. Robert conceded that all of the personal items found in the car when it was searched belonged to Michael, while none of Robert's personal items were located in the car
 
 
 [4]
 The court noted that the three notes totalling $16,000 for the down payment conveniently evaded that $10,000 reporting threshold. Although the judge acknowledged that Robert probably had no idea that banks were required to report cash transactions in excess of $10,000, she suspected that Michael was fully aware of this requirement and suggested that his father supply three different instruments for the down payment